792 A.2d 312

Jeff E. MESSING,

v.

BANK OF AMERICA, N.A.

No. 2646, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Feb. 28, 2002.

2

Jeff E. Messing, Appellant, pro se.

Dennis P. McGlone and Brian L. Moffet (Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, on the brief), Baltimore, for appellee.

Submitted before DAVIS, DEBORAH S. EYLER, and KRAUSER, JJ.

KRAUSER, Judge.

This appeal focuses on one of the most expressive parts of the human body—the thumb: "thumbs up" (approval), "thumbs down" (disapproval), "thumbing one's nose" (defiance), and "thumbing a ride" (requesting transport).[1] Notwithstanding all of the things we ask of this unassuming two-jointed digit, appellee, Bank of America, adds one more task—personal identification. The thumbprint, if Bank of America has its way, will now be one more means by which the identity of a non-account check holder is expressed and confirmed. This idea has of course not met with universal approval, and that is why this matter of first impression is now before us.

Specifically, we are presented with the question of whether Bank of America's practice of requiring non-account check

---

1. Not to mention, we should add: "thumbing through" (perusing a document), "all thumbs" (clumsiness), and "under one's thumb" (dominance and control).

**6**

holders to provide a thumbprint signature before it will honor a check is lawful. Appellant, Jeff E. Messing, claims that it is not and filed a complaint for declaratory judgment in the Circuit for Baltimore City, requesting a declaration that the practice is illegal and an order requiring its cessation. In reply, appellee filed a motion for summary judgment. That motion was granted; appellant's complaint was dismissed; and this appeal followed.

In addition to the question of the legality of appellee's thumbprint signature program, appellant also raises questions as to whether appellee "accepted," "dishonored," or "converted" appellant's check upon presentment. All of these questions have been presented for our review and are set forth below as they appear in appellant's brief.

I. Did the circuit court err in construing the requirement of giving "reasonable identification" under [C.L.] § 3–501(b)(2) to require a thumbprint if demanded by a drawee to whom presentment of a check is made, notwithstanding the proffer of reasonable and customary documentary forms of identification?

II. Did the circuit court err in finding the appellee did not accept the particular check at issue, as "acceptance" is defined in [C.L.] § 3–409(a)?

III. Did the circuit court err in finding that the appellee did not dishonor the particular check at issue, as "dishonor" is defined in [C.L.] § 3–502(d)(1)?

IV. Did the circuit court err in finding the appellee did not convert the cash proceeds of the particular check at issue, as "conversion" is set out in [C.L.] § 3–420?

V. Did the circuit court err in not giving full effect to the plain language of [C.L.] § 3–111, that states that when no address is stated in an instrument, "the place of payment is the place of business of the drawee or maker. If the drawee or maker has more than one place of business, the place of business is any place of business of the drawee or maker chosen by the person entitled to enforce the instrument"?

VI. Did the circuit court err in granting appellee's motion for summary judgment and dismissing with prejudice as a matter of law the appellant's complaint for declaratory judgment?

For the reasons that follow, we hold that the circuit court did not err in granting summary judgment and dismissing appellant's complaint. Requiring thumbprint signatures for non-account check holders is lawful, and at no time did appellee accept, convert, or dishonor appellant's check.

However, because this appeal involves a request for declaratory judgment and the circuit court neither entered a written declaration of the rights of the parties nor did it file any written opinion which could be treated as a declaratory judgment, we shall vacate the judgment and remand this case to the circuit court to enter a written declaration of the rights of the parties consistent with this opinion. *Bushey v. Northern Assurance Co. of America,* 362 Md. 626, 651–52, 766 A.2d 598 (2001); *see also Maryland Ass'n of Health Maintenance Organizations v. Health Servs. Cost Review Comm'n,* 356 Md. 581, 741 A.2d 483 (1999)(" 'whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made.' ") (citation omitted). Before doing so, however, we shall review the merits of this case. *Bushey,* 362 Md. at 651–52, 766 A.2d 598 (2001); *see also Ashton v. Brown,* 339 Md. 70, 660 A.2d 447 (1995)(remand was appropriate action even though the merits of the controversy were addressed on appeal).

## Background

On August 3, 2000, appellant attempted to cash a check for $976 at the Light Street branch office of appellee in Baltimore City. That check was made out to appellant and drawn on a Bank of America customer checking account.

Upon entering the bank, appellant handed the check to a teller. The teller then confirmed the availability of the funds on deposit, and placed the check in a computer validation slot.

After "validating" the availability of those funds, the computer stamped the time, date, account number, and teller number on the back of the check. It also placed a hold on $976 in the drawer's account.

The teller then gave the check back to appellant to endorse. After he had endorsed the check, the teller asked appellant for identification. In response, appellant presented his driver's license and a major credit card. The identification information on the license and credit card was then transferred by the teller to the back of the check.

During this transaction, the teller asked appellant if he was a Bank of America customer. When he said "no," the teller returned the check to appellant and requested that he place his "thumbprint signature" on the check in accordance with appellee's thumbprint signature policy for "non-account holders." That policy, which is posted at each teller's station,[2] requires a non-account holder, seeking to cash a check drawn on a Bank of America customer account, to provide a thumbprint signature.

The provision of such a signature is neither messy nor time consuming. A thumbprint signature is created by applying one's right thumb to an inkless fingerprinting device that leaves no ink stain or residue. The thumbprint is then placed on the face of the check between the memo and signature line.

After requesting appellant's thumbprint signature, the teller counted out $976 in cash from her drawer anticipating that appellant would comply with that request. When he refused to do so, the teller indicated that the bank would not be able to complete the transaction without his thumbprint. Appellant then asked to see the branch manager, and the teller referred him to a "Mr. Obrigkeit," the branch manager.

---

2. Signs relating to the Federal Deposit Insurance Corporation are attached to the writing surface at each teller's station. The lower right quadrant of each sign declares: "Thumbprint Signature Participating Member. For the protection of our customers, Thumbprint Signatures will be obtained from all non-account holders seeking to cash checks."

Upon entering the branch manager's office, appellant demanded that the check be cashed despite his refusal to place his thumbprint on the check. The branch manager examined the check and returned it to appellant explaining that because appellant was not an account holder, Bank of America would not cash the check without his thumbprint on the instrument. The requirement of a thumbprint signature from non-account holders was in accordance with the deposit agreement that Bank of America has with each of its account holders. That agreement states that Bank of America is permitted "to establish physical and/or documentary requirements" of payees or other holders who seek to cash an item drawn on a Bank of America customer's account.

Appellant then requested that the branch manager provide him with a copy of the Bank's thumbprint policy. The branch manager contacted appellee's regional headquarters and was informed that no such information was available for public distribution. After the branch manager conveyed that information to appellant, appellant left the bank. Moments later, the teller released the hold on the customer's funds, voided the transaction in the computer, and placed the $976 in cash back in her drawer.

Indignant over the bank's policy, appellant filed a complaint for a declaratory judgment requesting the circuit court to "determine and declare" that 1) appellant had provided appellee with "reasonable identification" without his thumbprint; 2) requiring a thumbprint is not "reasonable identification" under Maryland Code (1975, 1997 Repl.Vol., Supp.2000), § 3–501(b)(2) of the Commercial Law Article ("C.L."); [3] 3) requiring a thumbprint of non-account holders to cash a check is "illegal, inappropriate, and unnecessary;" 4) requiring non-account holders to provide a thumbprint is an invasion of

---

3. Titles 1 through 10 of the Commercial Law Article of the Maryland Code (also known as the Maryland Uniform Commercial Code) are "generally verbatim ... of the Official Text of Uniform [Commercial Code ("U.C.C.")]." The General Revisor's Note to the Maryland U.C.C. indicates that, except for "corrective changes" and Article 9, the Maryland U.C.C. contains the same language as the U.C.C.

privacy; 5) non-account holders need not provide a thumb-print to cash a check with appellee; 6) appellee had accepted the check; 7) appellee had wrongfully dishonored the check; and 8) appellee had wrongfully converted the check. Appellant also requested that the circuit court order appellee to cease and desist from requiring thumbprint signatures in Maryland.

In reply, appellee filed a motion to dismiss appellant's complaint or, in the alternative, for summary judgment. Appellant then responded by filing an opposition to appellee's motion and a cross motion for summary judgment. At a hearing on those motions, the circuit court entered summary judgment in favor of appellee and dismissed appellant's complaint with prejudice.

## Standard of Review

In evaluating appellant's contention that the circuit court erred in granting appellee's motion for summary judgment, we observe that summary judgment is appropriate only when, after viewing the motion and response in favor of the non-moving party, there is no genuine issue of material fact, and the party in whose favor judgment is entered is entitled to judgment as a matter of law. *Pittman v. Atlantic Realty Co.*, 127 Md.App. 255, 269–70, 732 A.2d 912, *rev'd on other grounds,* 359 Md. 513, 754 A.2d 1030 (2000); Md. Rule 2–501(e). In other words, once we have concluded that there is no genuine issue of material fact, our standard of review "is whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990). Applying that standard to the instant case, we conclude, for the reasons set forth below, that the circuit court was legally correct in granting appellee's motion for summary judgment and dismissing with prejudice appellant's complaint.

## Discussion

### I.

Appellant contends that the circuit court erred in construing the "reasonable identification" requirement of C.L. § 3–

501(b)(2) to include a thumbprint signature if demanded by appellee, notwithstanding appellant's proffer of his driver's license and a credit card. C.L. § 3–501(b)(2) provides:

> Upon demand of the person to whom presentment is made, the person making presentment must (i) exhibit the instrument, (ii) give **reasonable identification** and, if presentment is made on behalf of another person, reasonable evidence of authority to do so, and (iii) sign a receipt on the instrument for any payment made or surrender the instrument if full payment is made. (Emphasis added).

Because C.L. § 3–501(b)(2) does not define "reasonable identification," appellant maintains that we should look to Title 31, § 103.28 of the Code of Federal Regulations ("CFR") [4] which, according to appellant, does. That regulation was promulgated by the United States Department of the Treasury pursuant to the Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.*[5] For certain cash transactions exceeding $10,000 per business day,[6] 31 C.F.R. § 103.28 requires that financial institutions handling such transactions verify "the identity ... of any person or entity on whose behalf such transaction is to be effected." That verification is to "be made by examination of a document, other than a bank signature card, that is normally acceptable within the banking community as a means of identification when cashing checks for nondepositors (*e.g.,* a drivers [sic] license or credit card)." *Id.* Because 31 C.F.R.

---

4. 31 C.F.R. § 103.27 (52 Fed.Reg. 11443); as amended 52 Fed.Reg. 12641 (1987); 54 Fed.Reg. 3027 (1989). Redesignated at 31 C.F.R. § 103.28 (54 Fed.Reg. 33678 (1989)); 58 Fed.Reg. 45263 (1993); 59 Fed.Reg. 61662 (1994).

5. Pub.L. No. 91–508, 84 Stat. 1114 (1970) (codified as amended in 12 U.S.C., 15 U.S.C. and 31 U.S.C.). The Bank Secrecy Act "empowers the Secretary of the Treasury to require financial institutions to keep records and file reports that the Secretary determines have a high degree of usefulness in criminal, tax, and regulatory matters." 52 Fed.Reg. 11436 (1987).

6. *See* 31 C.F.R. § 103.22 (requiring regulated entities, including banks and other financial institutions, to file a report for each cash transaction exceeding $10,000 on one business day).

§ 103.28 recognizes a driver's license or credit card as a reasonable method for establishing "identification when cashing checks for nondepositors," appellant argues that other methods of identification, such as appellee's thumbprint signature program, are unreasonable. We disagree.

While 31 C.F.R. § 103.28 does indicate that a driver's license or a credit card may be an acceptable form of identification for certain transactions in excess of $10,000, it does not, as appellant suggests, preclude appellee from requiring a thumbprint signature of non-account holders who wish appellee to honor their checks. A "drivers license [sic] or credit card," according to 31 C.F.R. § 103.28, are only examples of the types of identification "normally acceptable within the banking community as a means of identification when cashing checks for nondepositors." Nowhere does 31 C.F.R. § 103.28 suggest that a driver's license and a credit card are the only acceptable forms of identification. Nor does 31 C.F.R. § 103.28 preclude a financial institution from requesting additional or alternative forms of identification.

Indeed, if the Treasury Department had intended to limit reasonable identification under 31 C.F.R. 103.28 to just a driver's license and a credit card, it could have done so. But it did not. Nonetheless, appellant would have us disregard a cardinal tenet of statutory construction that a court may not "omit words to make a statute express an intention not evidenced in its original form," [7] by omitting the language in 31 C.F.R. 103.28 indicating that a driver's license or a credit card are only examples of reasonable identification and not the only acceptable forms of such identification.

While the phrase "reasonable identification" under former U.C.C. § 3–505(1)(b), now codified in Maryland as C.L. § 3–501(b)(2), has been addressed by the other state courts in

---

7. *Board of Educ. of Garrett County v. Lendo*, 295 Md. 55, 63, 453 A.2d 1185 (1982)("Absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory.").

other contexts,[8] what constitutes "reasonable identification" under C.L. 3–501(b)(2)—particularly whether a "thumbprint signature" does—is a question that has not been addressed by any federal or state court, at least not in any reported opinion.

 Appellee's thumbprint requirement is a form of "reasonable identification" for a number of reasons. First, a thumbprint signature has been accepted by the drafters of the Maryland UCC as an effective, reliable, and accurate way to authenticate a writing on a negotiable instrument.

"In accord with the systematic presentation of the UCC and its use of consistent terminology," U.C.C. § 1–201 sets forth "46 basic terms" to be used throughout the Code to "offer a starting point for the interpretation of many Code sections." 1 William D. Hawkland, *Uniform Commercial Code Series,* § 1–201:1 (1998). The term "signed" is defined in C.L. § 1–201(39)(1975, 1997 Repl.Vol.) as "any symbol executed or adopted by a party with present intention to authenticate a writing," and that definition applies throughout the Maryland UCC. As to what "signed" means, the Official Comment to C.L. § 1–201(39) states:

The inclusion of authentication in the definition of "signed" is to make clear that as the term is used in this Act a

---

8. *Wilner v. O'Donnell,* 637 S W.2d 757, 760 (Mo.App.1982)(noting that under former UCC § 3–505(1)(b) the maker of a note may require, without dishonor, ... *"reasonable identification* of the person making presentment together with evidence of his authority to make [presentment] if made for another")(emphasis added); *Rockland Trust Co. v. South Shore Nat. Bank,* 366 Mass. 74, 314 N.E.2d 438, 441 (1974)(using former § 3–505(1)(b) as "an analogical basis for interpreting the requirement that the check be 'properly endorsed.' "); *Wright v. Bank of California, N.A.,* 276 Cal.App.2d 485, 491, 81 Cal.Rptr. 11 (1969)("[S]ection 3–505 does not purport to establish any duty on the part of the bank; the specified precautions are merely made available to the drawee without danger that dishonor of the instrument will be found to have occurred."). *See also Temple–Eastex Inc. v. Addison Bank,* 672 S.W.2d 793, 796–97 (Tex.1984) (circumstances surrounding a demand for payment by distributee of assets of non-existent beneficiary of letter of credit should have put issuer of that letter on notice as to distributee's rights since issuer could have required evidence (i.e. reasonable identification under former § 3–505) of distributee's authority to make presentment of the letter of credit).

complete signature is not necessary. Authentication may be printed, stamped or written; it may be by initials or by **thumbprint.**

C.L. § 1–201, Official Comment 39 (1975, 1997 Repl.Vol.)(emphasis added).

Among the sections of the Maryland UCC employing the term "signed," which, as noted, includes a thumbprint, are: C.L. § 3–401(a)(holding that a "person is not liable on an instrument unless (i) the person *signed* the instrument.")(emphasis added); C.L. § 3–402(a)("If a person acting ... as a representative *signs* an instrument ..., the represented person is bound by the signature ....")(emphasis added); C.L. § 3–403(a)("[A]n unauthorized *signature* is ineffective except ... in favor of a person who in good faith pays the instrument or takes it for value.")(emphasis added); C.L. § 3–419(b)("An accommodation party may *sign* the instrument [and] ... is obliged to pay the instrument in the capacity in which the accommodation party *signs.*")(emphasis added). Consequently, a thumbprint is deemed an acceptable and reliable form of signature throughout the Maryland UCC.

Second, the process that a non-account holder goes through to provide a thumbprint signature is not unreasonably inconvenient. As noted, non-account holders seeking to cash a check are asked to apply their right thumb to an inkless fingerprinting device to create a "thumbprint signature." Unlike fingerprinting—which has repeatedly been upheld as an "unobtrusive" form of identification [9]—thumbprint signatures

---

9. The use of fingerprints, as a form of identification, has been approved in many noncriminal contexts. *See, e.g., Perkey v. Department of Motor Vehicles,* 42 Cal.3d 185, 228 Cal.Rptr. 169, 721 P.2d 50 (1986) (state law requiring an individual to provide a fingerprint as a condition for obtaining a drivers license upheld); *see also Thom v. New York Stock Exch.,* 306 F.Supp. 1002 (S.D.N.Y.1969), *aff'd sub. nom., Miller v. New York Stock Exch.,* 425 F.2d 1074 (2d Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970)(state law requiring employees in the securities industry to provide fingerprints was upheld); *People v. Stuller,* 10 Cal.App.3d 582, 89 Cal.Rptr. 158 (1970)(municipal ordinance requiring bartenders to submit fingerprints to the local police department upheld); *Brown v. Brannon,* 399 F.Supp. 133 (M.D.N.C.1975);

do not require application of ink nor do they require the participation of more than one digit. In fact, appellant's thumbprint signature program uses an inkless fingerprinting device that leaves no ink stains or residue.

And third, this procedure is a reasonable and necessary answer to the growing incidence of check fraud. The American Bankers Association has reported that check fraud losses have grown, between 1995 and 1997, at an average rate of 17.5 percent. Carreker–Antinori, *Provide Your Bank with a Shield of Protection against Check Fraud,* Thompson Financial Publishing, at *http://www.tfp.com/text/Fraudlink.pdf.* "Industry estimates based on survey data show that actual losses from check fraud amounted to $512.3 million in 1997, a 5.2 percent increase over the $487.1 million estimated for 1995." *Id.*

As a result of the rising level of check fraud, thumbprint programs, as appellee notes, "have been endorsed by the American Bankers Association and more than thirty (30) state bankers associations including Arizona, Maryland, Missouri, Oregon, Texas, Utah and Virginia." Testifying before the United States House of Representatives as to the effectiveness of these programs, Charles L. Owens, former Chief of the Financial Crimes Section of the FBI, stated:

> We have supported implementation of inkless fingerprint policies which have been adopted by over 20 State bankers associations for non-bank customers negotiating checks. Where implemented, these procedures have successfully reduced negotiation of stolen and counterfeit checks by as much as 50 percent.

*Computer Generated Check Fraud, Subcommittee on Domestic and International Monetary Policy, Committee on Banking and Financial Services,* U.S. House of Representatives, May 1, 1997; *see also Perkey v. Department of Motor Vehicles,* 42 Cal.3d 185, 228 Cal.Rptr. 169, 721 P.2d 50, 53

---

*aff'd,* 535 F.2d 1249 (4th Cir.1976)(municipal ordinance requiring fingerprinting of applicants for business license upheld).

(1986)(stating that the fingerprint requirement is one of the few non-invasive reliable means of combating rampant fraud).

Finally, appellant's contention that a thumbprint does not serve the purposes of the Act is unpersuasive. We agree with appellant that a thumbprint cannot be used, in most instances, to confirm the identity of a non-account checkholder at the time that the check is presented for cashing, as his or her thumbprint is usually not on file with the drawee at that time. We disagree, however, with appellant's conclusion that a thumbprint signature is therefore not "reasonable identification" for purposes of C.L. § 3–501(b)(2).

Nowhere does the language of C.L. § 3–501(b)(2) suggest that "reasonable identification" is limited to information appellee can authenticate at the time presentment is made. Rather, all that is required is that the "person making presentment must ... give reasonable identification." C.L. § 3–501(b)(2). While providing a thumbprint signature does not necessarily confirm identification of the checkholder at presentment—unless of course the drawee bank has a duplicate thumbprint signature on file—it does assist in the identification of the checkholder should the check later prove to be bad. It therefore serves as a powerful deterrent to those who might otherwise attempt to pass a bad check. That one method provides identification 'at the time of presentment and the other identification after the check may have been honored, does not prevent the latter from being "reasonable identification" for purposes of C.L. § 3–501(b)(2).

## II.

Appellant contends that the circuit court erred in holding that appellee did not "accept" the check at issue under C.L. § 3–409(a)(1975, 1997 Repl.Vol.). That section provides:

"Acceptance" means the drawee's signed agreement to pay a draft as presented. It must be written on the draft and may consist of the drawee's signature alone. Acceptance may be made at any time and becomes effective when notification pursuant to instructions is given or the accepted

draft is delivered for the purpose of giving rights on the acceptance to any person.

Appellant claims that the teller had accepted the draft in question and that appellee was therefore required to pay it at the time of acceptance. Indeed, C.L. § 3–413(a)(1975, 1997 Repl.Vol.) states that "[t]he acceptor of a draft is obliged to pay the draft (i) according to its terms at the time it was accepted." Moreover, "[i]f a draft is accepted by a bank, the drawer is discharged, regardless of when or by whom acceptance was obtained." C.L. § 3–414(c). Therefore, according to appellant, "the check that was returned to the Appellant when the Appellee wrongfully refused to pay the Appellant the proceeds of same is no longer negotiable and the drawer's obligation to Appellant was discharged."

In support of his claim that his check was accepted by appellee, appellant cites the testimony of the teller that she "put the Check into the validation slot of [her] computer and validated the Check." By that act, appellant claims, appellee endorsed the check. And indeed, a "signature may be made (i) manually or by means of a device or machine, and (ii) by the use of any name, including a trade or assumed name, or by a word, mark, or symbol executed or adopted by a person with present intention to authenticate a writing." C.L. § 3–401(b).

Appellant then points to Official Comment 2 to C.L. § 3–409(a), which states that, as a general rule, "the mere signature of the drawee on the instrument is a sufficient acceptance." He therefore concludes that appellee's placement of that check in the validation slot of the computer constituted "acceptance." We disagree and hold that the check in question was not "accepted" as that term is defined by C.L. § 3–409(a).

To constitute an "acceptance" under C.L. § 3–409(a), the acceptance must be:

(1) in writing, (2) written on the instrument itself, (3) signed **and** (4) delivered to the holder or the holder notified * * *

Although usually an obligation on a negotiable instrument is not effective until the instrument is delivered, an **acceptance becomes operative when completed either by delivery or by notification [by the drawee].** By permitting an acceptance to be effective upon notification, the acceptance becomes effective earlier and delay is avoided. The notification must indicate that there has been a written acceptance and must be sent to the holder or to another person at the holder's direction.

6 William D. Hawkland, *Uniform Commercial Code Series,* [Rev] § 3–409:2 (1999)(emphasis added)(footnotes omitted).

In other words, for an acceptance to occur, appellant must establish that the instrument was signed by the appellee and that the latter notified appellant that it had accepted it. *See e.g., Union Export Co. v. N.I.B. Intermarket, A.B.,* 786 S.W.2d 628, 629 (Tenn.1990)(bank accepted draft where it both signed draft and sent notice of acceptance under former 3–410); [10] *Merson v. Sun Ins. Co. of New York,* 44 Misc.2d 131, 253 N.Y.S.2d 51, 52–53·(1964)( [D]rawee bank did not irrevocably accept [a] draft by notification or delivery, despite drawee's tentative approval of the check by placing the words "upon acceptance [by the drawee bank]" on it.); *see also Schering–Plough Healthcare Products, Inc., v. NBD Bank, N.A.,* 98 F.3d 904, 908 (6th Cir.1996)(holding that the words "No Stops" [indicating no stop payments] and "TV" [initial of drawee bank employee providing that information] on the back of two checks did not evidence a "signed agreement" or "intent to pay the drafts" to constitute acceptance under the UCC § 3–409(a)).

While Bank of America's stamping of the check may constitute a "signed agreement" to pay the check as presented,

---

**10.** "The first three subsections of Section 3–409 is a restatement of former Section 3–410." Official Comment 1 of C.L. § 3–409 (1997 Repl.Vol.). Former section 3–410(1) provided "[a]cceptance is the drawee's signed engagement to honor the draft as presented. It must be written on the draft, and may consist of his signature alone. It becomes operative when completed by delivery or notification."

there is no evidence that appellee notified or delivered notification to appellant that an acceptance had occurred.

As noted earlier, the check was given back to appellant by the teller so that he could put his thumbprint signature on it, not to notify or give him rights on the purported acceptance. After appellant declined to put his thumbprint signature on the check, he was informed by both the teller and the branch manager that it was against bank policy to honor the check without a thumbprint signature. Indignant, appellant walked out of the bank with the check. Because appellant did not comply with appellee's request to provide a thumbprint signature when the check was handed over, it cannot be said that there was an "accepted draft . . . delivered [by appellee] for the purpose of giving rights on the acceptance to" appellant. C.L. § 3–409(a).

## III.

Appellant further asserts that the circuit court erred in holding that the appellee did not dishonor the check under C.L. § 3–502(d)(1). That section provides that "if the draft is payable on demand, the draft is dishonored if presentment for payment is duly made to the acceptor and the draft is not paid on the day of presentment." Because the check "presented to [appellee] was payable on demand" and because appellee "accepted the check on August 3, 2000, but did not make payment on that date," appellant concludes that appellee "dishonored the check."

C.L. § 3–502(d)(1), however, is not relevant to the instant case because the check in question, as we concluded earlier, was never accepted by appellee. In other words, appellant cites the wrong section of the UCC. The section that appellant should have cited is C.L. § 3–502(b)(2), as it applies to dishonored "unaccepted" checks.

That section provides that if an unaccepted "draft is payable on demand . . . the draft is dishonored if presentment for payment is duly made to the drawee and the draft is not paid on the day of presentment." C.L. § 3–502(b)(2). There is no

dishonor, however, if presentment fails "to comply with the terms of the instrument, an agreement of the parties, or other applicable law or rule." C.L. § 3–501(b)(3). In the words of one authority:

> If the presentment is not proper, payment or acceptance may be refused by the presentee and this refusal does not constitute a dishonoring of the instrument. This provision comes into play if the presentment does not comply "with the terms of the instrument, an agreement of the parties, or other applicable law or rule."

6B *Anderson on the Uniform Commercial Code* [Rev] § 3–501:15(3d Ed.1998).

 It is undisputed that appellee had the authority to refuse payment in accordance with the deposit agreement it had with each account holder, including with the drawer of the check in question. Pursuant to that agreement, appellee was permitted to set "physical and/or documentary requirements" for all those who seek to cash a check with appellee. And because appellee had the authority to refuse payment by agreement with its customer under C.L. § 3–501(b)(2)(ii) unless "reasonable identification" was presented, appellant's failure to provide his thumbprint rendered the presentment ineffective and did not result in a dishonor of the check when appellee returned it to him.

## IV.

Appellant contends the circuit court erred in holding that appellee "did not convert the cash proceeds of the particular check at issue, as 'conversion' is set out" in C.L. § 3–420(a) (1975, Repl.Vol.1997, Cumm.Supp.2000). That subsection provides:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.

Appellant argues that because appellee's teller took possession of the check and then counted and separated out the proceeds of the check to pay them to appellant, the failure of the teller to then do so constituted a conversion. In appellant's words, he "was deprived of the proceeds to which he was entitled to possess at that time, and the refusal of [appellee] to turn over the proceeds to [him] was a conversion." We disagree.

Appellant unfortunately confuses the check, which was his property, with the proceeds of that check, which were not. The proceeds of the check belonged to the bank until paid over to appellant—which of course they never were because of appellant's refusal to provide a thumbprint signature.

"Conversion," we have held, "requires not merely temporary interference with property rights, but the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor." *Yost v. Early*, 87 Md.App. 364, 388, 589 A.2d 1291 (1991) (citations omitted)(quotations omitted). At no time did appellee exercise "unauthorized dominion and control [over the check] to the complete exclusion of the rightful possessor," appellant.

Appellant voluntarily gave the check to appellee's teller. When appellant indicated to the teller that he was not an account holder, she gave the check back to him for a thumbprint signature in accordance with bank policy. After being informed by both appellee's teller and branch manager that it was appellee's policy not to cash a non-account holder's check without a thumbprint signature, appellant left the bank with the check in hand.

Because appellant gave the check to the teller, appellee's possession of that check was anything but "unauthorized." And, having returned the check, within minutes of its receipt, to appellant for his thumbprint signature, appellant never exercised "dominion and control [over it] to the complete exclusion of the rightful possessor," appellant. In short, there was no conversion.

## V.

Finally, appellant contends that the circuit court erred in not giving full effect to the plain language of C.L. § 3–111 (1975, 1997 Repl.Vol.). That section provides:

[A]n instrument is payable at the place of payment stated in the instrument. If no place of payment is stated, an instrument is payable at the address of the drawee or maker stated in the instrument. If no address is stated, the place of payment is the place of business of the drawee or maker. If a drawee or maker has more than one place of business, the place of payment is any place of business of the drawee or maker chosen by the person entitled to enforce the instrument.

Appellant argues that since neither the place of payment nor the address of the drawee or maker was stated in the check, the check was payable at any place of business of appellee (the drawee) chosen by the appellant (the person entitled to enforce the instrument). Thus, once appellant was in a branch office of appellee, the bank was required to pay the check under C.L. § 3–111. Otherwise, appellant argues, C.L. § 3–111 would have no meaning. That argument is also without merit.

C.L. § 3–111 provides that an instrument will be paid at the location specified in that instrument. In the event that no location is specified, C.L. § 3–111 provides that the appropriate place of payment of an instrument is "the place of business of the drawee." As appellee was the drawee, any of its branch offices was an appropriate place to present the check in question. Although the location was correct, presentment was not.

 " 'Presentment' means a demand made by or on behalf of a person entitled to enforce an instrument" by either paying the instrument or accepting the draft. C.L. § 3–501(a). Proper presentment, however, depends upon more than a demand for payment at the right location. Indeed, an instrument may be returned to its presenter, as appellant concedes, for "lack of reasonable identification by the person

making presentment," or, for that matter, for failing to comply with any of "the terms of the instrument, an agreement of the parties, or other applicable law or rule." C.L. § 3–501(b)(3). By refusing to provide a thumbprint signature, appellant violated appellant's rules for honoring a non-account holder's check. This failure rendered appellant's presentment ineffective. Accordingly, appellant's C.L. § 3–111 argument is unpersuasive.

## VI.

As noted, because this appeal involves a request for declaratory judgment, the circuit court must enter "a written declaration of the rights of the parties" or file a "written opinion" which could be treated as such. *Bushey v. Northern Assurance Co. of America,* 362 Md. 626, 651–52, 766 A.2d 598 (2001). Because it did not, we shall vacate the judgment and remand the case to the circuit court to enter a written declaration of the rights of the parties consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLANT.**