GILLEN ET AL., AS SUCCESSORS IN INTEREST TO JOHN F. C. APPEL *v.* MARYLAND NATIONAL BANK ET AL.

[No. 106, September Term, 1974.]

*Decided March 4, 1975.*

The cause was argued before MURPHY, C. J., and SMITH, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*William S. Little,* with whom was *Alexander Stark* on the brief, for appellants.

*Thomas C. Beach, III,* with whom were *Walter E. Black, Jr.,* and *Clapp, Somerville, Black & Honemann* on the brief, for Maryland National Bank, part of appellees.

*John C. Griffin,* with whom were *Richard W. Kiefer* and *Hooper, Kiefer, Cornell & O'Ferrall* on the brief, for Equitable Trust Company, other appellees.

MURPHY, C. J., delivered the opinion of the Court.

Elizabeth Gillen, et al., as successors in interest to John F. C. Appel who died October 23, 1972 (the appellants), appeal from judgments entered by the Court of Common Pleas of Baltimore City in favor of Maryland National Bank and Equitable Trust Company. The controversy arose from two separate but related transactions: the unauthorized withdrawal of $7,200 from Appel's savings account with Maryland National by means of a forged withdrawal slip, and the collection and payment of Maryland National's cashier's check upon the payee's forged endorsement.

The pertinent facts are these: Appel opened a savings account with Maryland National in 1966. The account was in his name, in trust for himself and Elizabeth Gillen, as joint owners, subject to the order of either, the balance at the death of either to belong to the survivor. Appel retained possession of the passbook, which contained a number of rules and regulations pertaining to the rights and obligations of the depositor and the bank, including the following:

> "Possession of the Passbook may be treated by the Bank as sufficient evidence of ownership thereof to authorize the payment of money due

thereon. The Bank will endeavor to prevent fraud on its depositors, yet all the payments made by the Bank to any person producing the Passbook shall be valid as against the depositor and a full and effectual release thereof to the Bank, unless and until the Bank shall have received from the depositor written notice not to make such payment."

\* \* \*

"The acceptance of the Passbook shall constitute an acknowledgement on the part of the depositor of notice of these Rules and Regulations and his agreement to be bound thereby."

On April 27, 1970, Randolph White Via appeared at the southern branch of Maryland National, where Appel maintained his savings account; Via had Appel's passbook in his possession, together with an "off-the-premises" withdrawal slip, containing Appel's forged signature authorizing a $7,200 withdrawal payable to Appel's order or to bearer. Comparing the signature on the withdrawal slip with the signature on Appel's signature card, the teller determined that they were identical. Via explained to the teller and to the branch manager that Appel owed him the money for repairs which he had completed on Appel's home. With the approval of the branch manager, Via was given Maryland National's cashier's check for $7,200 payable to Appel's order.

Via forged Appel's endorsement on the check and the next day delivered the check to Len Cavanaugh, who endorsed it in the name of his business, Len's Tavern and Restaurant, Inc., and deposited it in his account with Equitable. At the same time, Cavanaugh drew a $7,200 check on his Equitable account, payable to cash. Equitable cashed the check and Cavanaugh delivered the money to Via. Equitable endorsed Maryland National's cashier's check and forwarded it for payment. Maryland National paid the item on April 29. Thereafter, Appel discovered that his Maryland National passbook had been stolen and, on May 5, 1970, he executed

an affidavit that he had not endorsed the cashier's check or received the check. Maryland National then sought reimbursement of the $7,200 from Equitable, which declined to make payment.

On June 1, 1972, Appel sued Maryland National for $7,200 damages with interest by a declaration containing two counts, both sounding in contract. The first count was " [f]or money found to be due from the Defendant to the Plaintiff on accounts stated between them" ; the second count alleged that "on or about April 28, 1970 the Plaintiff had on deposit with the Defendant in a savings account the sum of . . . $7,200.00 and that the Defendant has failed to pay this sum unto the Plaintiff despite numerous demands therefor." In response to Maryland National's request for particulars, Appel stated that the second count was "a further explanation of the general count No. One." Maryland National answered with general issue pleas and a special plea asserting the defense of release. It also filed a third party claim against Equitable, asserting the latter's warranty of good title to and guaranty of prior endorsements on the cashier's check. Appel thereafter sued Equitable, claiming $7,200 with interest, (1) for money received by Equitable for Appel's use, (2) because Equitable guaranteed prior endorsements on the forged cashier's check, and (3) " [t]hat said check was accepted under circumstances in which . . . Equitable . . . knew 'or should have known that the transaction was improper, fraudulent and/or illegal." Equitable answered with general issue pleas.

Two days before the trial in November 1973 — approximately three and a half years after payment of the cashier's check — the appellants sought to amend their declarations by adding a count for conversion based upon Maryland Code (1964 Repl. Vol.) Art. 95B, § 3-419 of the Uniform Commercial Code; [1] specifically, it was alleged that

---

1. That section, insofar as pertinent, provides:

    " (1)  An instrument is converted when

    * * *

    (c)  It is paid on a forged indorsement."

"the Defendants did wrongfully convert to their use monies that were and are the property of the Plaintiff." Both Maryland National and Equitable objected, in motions ne recipiatur, claiming that the original declarations sounded only in contract and that the count for conversion sought to be added sounded in tort and constituted a new cause of action under a different theory of law which was barred by the three-year statute of limitations. The court granted the motions ne recipiatur, denied appellants' petition to amend, and ordered the consolidated cases to proceed to trial on the original counts of the declarations.

Following an evidentiary hearing, the court (Cole, J. sitting without a jury) concluded, contrary to appellants' principal contention at the trial, that Maryland National had exercised ordinary care and hence had not been negligent in issuing the cashier's check. In so holding, the court noted that Via had the passbook in his possession, that the signatures on the withdrawal slip and the signature card compared favorably, and that Maryland National had made the check payable to Appel, rather than to bearer. The court said that there was no obligation on Maryland National's part to make a telephone call or send a messenger to Appel's house to verify the validity of the transaction. As to the alleged conversion of the instrument, the court said that the claim failed for "want of proper pleading." The appeal here follows the entry of judgments in favor of Maryland National and Equitable upon the court's finding that neither was liable for Appel's loss.

The relationship between a savings bank and a depositor is a contractual one, of which the rules and regulations of the passbook are a part. *Hileman v. Hulver,* 243 Md. 527, 221 A. 2d 693 (1966); *Savings Bank v. Appler,* 151 Md. 571, 135 A. 373 (1926). Implicit in the contract is the duty of the bank to use ordinary care in disbursing the depositor's funds. *Commonwealth Bank v. Goodman,* 128 Md. 452, 97 A. 1005 (1916). The duty cannot be abrogated by agreement. Code (1964 Repl. Vol.) Art. 95B, §§ 1-102 (3), 4-103. Thus, a depositor may sue in an action for breach of contract to enforce the bank's contractual obligation to use ordinary

care. *Commonwealth Bank v. Goodman, supra. See also Taylor v. Equitable Trust Co.,* 269 Md. 149, 304 A. 2d 838 (1973).

Appellants contend on appeal, as they did below, that Maryland National did not exercise ordinary care in allowing the withdrawal of funds from Appel's account; they rely upon *Commonwealth Bank v. Goodman, supra.* In that case, the plaintiff Goodman authorized Edith Webb, the 15-year-old daughter of friends with whom he was living, to open an account for him with the bank. Goodman's signature on the signature card consisted of his mark, witnessed by Edith. Edith retained possession of the passbook, and, from time to time, Goodman would give her checks and money to deposit. On those occasions when he wished to withdraw money, Goodman would always be accompanied by Edith. Edith, however, made unauthorized withdrawals by forging Goodman's mark and witnessing the forgery. Upon discovering the unauthorized withdrawals, Goodman sued upon his contract with the bank. On an appeal from a judgment in Goodman's favor, our predecessors noted that the bankbook issued to Goodman contained rules and regulations constituting his contract with the bank; that, pursuant thereto, it was provided (as in the instant case) that possession of the bankbook would be sufficient evidence of ownership and that payments made to any person producing the bankbook would be valid as against the depositor; and that such regulations were necessary for the protection of the bank. The Court stated that, notwithstanding such rules and regulations, the bank was contractually bound to exercise ordinary care in disbursing a depositor's funds. Citing text authority with approval, the Court said that the only rule to which savings banks could be safely held in determining what constituted a negligent payment of a depositor's funds was the rule of ordinary care, to be applied in the light of the special circumstances that characterize each separate case; that the question of due care and diligence on the part of the bank is one of fact for the jury if the evidence is conflicting, and one of law if the evidence is undisputed, and can lead to but one

reasonable conclusion; and that the burden of proving negligence was on the depositor. Although the Court said that Goodman's negligence would not absolve the bank from its duty to exercise ordinary care, Edith's possession of the passbook and her special relationship with Goodman, absent any indication that his mark had been forged, justified the bank's belief that the forged requests for withdrawal were genuine. It further concluded that the availability of additional measures which the bank could have taken was irrelevant so long as under the circumstances it exercised ordinary care.

We think that the evidence adduced at the trial amply supported the lower court's determination that Maryland National had not failed to exercise ordinary care in making the $7,200 disbursement of Appel's funds. The evidence showed that Appel, 85 years of age at the time of the fraudulent withdrawal, ailing and with an arthritic condition, relied heavily upon two nieces for assistance in his business affairs. On numerous occasions his nieces made withdrawals from his account at Maryland National by presenting the passbook and an off-the-premises withdrawal slip signed by him. Both the teller and branch manager who completed the transaction in question knew of Appel's condition and were accustomed to having others withdraw funds for him. When Via entered the bank with Appel's passbook and an off-the-premises withdrawal slip purportedly signed by Appel, and witnessed by one Alvin Hatfield, he identified himself, said that Appel owed him the money for home repairs he had done, and that Appel was unable to come to the bank.[2] After requiring Via to endorse the reverse side of the withdrawal slip, the bank compared Appel's signature on the withdrawal slip with that on his bank signature card; they compared favorably, indeed so favorably that appellants' own expert witness said that the forgery was a good one, not detectable by a layman without the aid of special equipment. The bank declined to permit

---

**2.** There was evidence showing that off-the-premises withdrawal slips were not available in the public portions of the bank, but that it was necessary to obtain them by asking a teller.

Via to make the withdrawal in cash, as he would have preferred; instead it issued a cashier's check payable to Appel. The evidence showed that Via was polite and accepted the bank's decision with grace.

Possession of the passbook is, of course, an important factor in determining whether the bank exercised ordinary care. *See Hileman v. Hulver, supra; Savings Bank v. Appler, supra.* The requirement of ordinary care dictates more than just payment to one possessing a passbook; the passbook must be accompanied by a withdrawal slip or order containing the depositor's signature. *See Savings Bank v. Holzer,* 175 Md. 481, 2 A. 2d 639 (1938). Whether possession of a passbook and a favorable comparison of the forged signature on the withdrawal slip with the depositor's actual signature would, without more, be sufficient to satisfy Maryland National's contractual obligation to exercise ordinary care need not be here decided. *Compare Novak v. Greater New York Savings Bank,* 30 N.Y.2d 136, 282 N.E.2d 285, 331 N.Y.S.2d 377 (1972), *with Bulakowski v. Philadelphia Sav. Fund Soc'y,* 270 Pa. 538, 113 A. 553 (1921). Considering all the circumstances of this case, and particularly the manner in which Appel was accustomed to conducting his business with the bank, Maryland National's efforts to prevent a fraud, including its disbursement of the funds by means of a cashier's check payable to Appel, plainly supported a finding that the bank exercised ordinary care. That the withdrawal was for such a large amount, only Appel's nieces had made prior withdrawals, and Maryland National did not contact either Appel or his nieces before disbursing the funds would not mandate a finding, as a matter of law, that Maryland National did not exercise ordinary care. Whether Maryland National exercised ordinary care was a matter for the trier of fact in this case; in no event could we conclude that the lower court was clearly erroneous in finding from the evidence that it did. *See* Maryland Rule 886.[3]

---

**3.** Nothing in Taylor v. Equitable Trust Co., 269 Md. 149, 304 A. 2d 838 (1973), also relied upon by appellants, dictates a contrary result. In that case, we held on facts far different from those here involved that the bank

Appellants next argue that since Appel never received the check or its proceeds, Maryland National still owes him the money. They maintain that because the cashier's check was only evidence of the bank's indebtedness, and not payment to Appel, payment of the cashier's check on the forged endorsement did not constitute a withdrawal from Appel's account. Since the point was neither raised nor decided in the proceedings below, we need not now consider it. Maryland Rule 885. It is nevertheless clear that the argument is without merit. Maryland National's contractual obligation to Appel was to use ordinary care in permitting withdrawals from the account. The issuance of its cashier's check does not alter this obligation, especially where, as here, Maryland National made final payment of the check before receiving notification of the forgery. *See* Code (1964 Repl. Vol.) Art. 95B, § 4-213. Thus, if Maryland National used ordinary care in authorizing the withdrawal, issuing a cashier's check, and paying the check, it has discharged its underlying contractual obligation to the depositor. That Maryland National may have been liable in a tort action, properly pleaded and timely filed, to the payee for conversion of the check, *i.e.*, for payment on a forged endorsement, Art. 95B, §§ 3-404, 3-419 (1) (c), is an issue separate from the matter of its contractual duty to exercise ordinary care in allowing the withdrawal by Via and paying the cashier's check issued upon the original withdrawal order. *See Levin v. Union National Bank,* 224 Md. 603, 607, 168 A. 2d 889, 891 (1961), stating:

> "The cases also recognize that the payee whose signature is forged would have a conversion action against the drawee, but not a contract action, for paying funds upon an instrument bearing his forged indorsement."

*See generally* O'Malley, *Common Check Frauds and the Uniform Commercial Code,* 23 Rutgers L. Rev. 189 (1968).

---

was negligent in transferring funds upon the claimed authority of an alleged agent without first contacting the principal. Unlike the present case, the agent's authority was not manifested by any instrument purportedly executed by the principal.

As heretofore indicated, the court below found that appellants' attempt to amend their declaration by adding a count in tort for conversion was untimely because it constituted a new cause of action which was barred by limitations. Appellants do not directly challenge this conclusion, but instead suggest that Maryland National's liability for conversion of the check can be redressed under the contract counts of the declaration. We cannot agree. In neither contract count is mention made of the cashier's check which appellants now claim was converted, nor is any allegation made of negligence or conversion. The case was tried below predominantly on the issue whether Maryland National breached its contractual duty to exercise ordinary care in honoring the off-the-premises withdrawal slip. Conversion is plainly a tort action. *Levin v. Union National Bank, supra; Kirby v. Porter,* 144 Md. 261, 125 A. 41 (1923); *Maryland Casualty Co. v. Wolff,* 180 Md. 513, 25 A. 2d 665 (1942). We think the conversion of the cashier's check by Maryland National was a matter not cognizable under the pleadings.

Appellants next claim that since Appel never received the proceeds or the check, Equitable, as the collecting bank, should be declared a constructive trustee of the funds for the benefit of Appel. Apparently they rely upon *Nat. Union Bank v. Rubber Co.,* 148 Md. 449, 129 A. 688 (1925), a case where the payee of checks cashed by the collecting bank on the payee's unauthorized endorsement was permitted to recover from the bank in a suit in equity upon the theory that the bank, in wrongful possession of the check, held the proceeds as a constructive trustee for the payee. *See also Levin v. Union National Bank, supra.* The appellants in the present case, however, sued in law, not in equity, and they neither pleaded nor raised the issue of a constructive trust before the trial court. Accordingly, the issue is not properly before us on appeal. Rule 885; *Thomas v. Corso,* 265 Md. 84, 108, 288 A. 2d 379 (1972).

Appellants advance the further contention that Equitable's participation in the processing of the cashier's check was not in accordance with reasonable commercial

standards of a collecting bank. The basis for this claim is not altogether clear. Appellants alleged in their third count against Equitable that it should have been aware of the impropriety of the transaction. Appellants unsuccessfully contended at the trial that this count would support a claim against Equitable based on Art. 95B, § 3-419 (3). That section provides:

> "Subject to the provisions of this article concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and *in accordance with the reasonable commercial standards* applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands."
> (Emphasis added.)

Apparently conceding that Equitable does not have any proceeds of the check in its hands, the appellants now argue that Equitable is liable under § 3-419 (3) for the conversion of the check because it failed to deal with the instrument in accordance with reasonable commercial standards.

Nowhere do the appellants' pleadings mention the conversion of the cashier's check. Nor do the pleadings allege facts which would support a cause of action for conversion. The first count was a contract count for money received by Equitable; the second count, which was based on Equitable's endorsement on the check, was abandoned at trial; and the most liberal reading of the third count, alleging Equitable's knowledge of the impropriety of accepting the check, cannot provide the elements or facts to support a cause of action for conversion. *See* Rule 301. *See generally Read Drug v. Colwill Constr.*, 250 Md. 406, 243 A. 2d 548 (1968); 1 J. Poe, *Pleading and Practice* §§ 206, 559, 574 at 163, 578, 595 (H. Tiffany ed. 1925). Since conversion is a tort action and since the appellants did not seek to add a count for conversion until three and a half years after the conversion of the check, the

cause of action for conversion is clearly barred by limitations.

Appellants' argument, however, is susceptible of another interpretation: that § 3-419 (3), as well as other sections of the Uniform Commercial Code, imposes on Equitable a duty to act in a commercially reasonable manner in cashing or collecting a cashier's check. Assuming that Equitable has such a duty, we think that the record shows that it acted in a commercially reasonable manner.

The evidence revealed that Via requested that Len Cavanaugh negotiate the cashier's check for him. Cavanaugh had on numerous occasions cashed checks for the patrons of his tavern, including Via. Since he had never before cashed a $7,200 check, Cavanaugh sought advice from the teller and the manager of the Equitable branch where he did his banking. Following their instructions, Cavanaugh endorsed the check in the name of his business, Len's Tavern and Restaurant, Inc., deposited it in his account, immediately drew a check on the account for cash, cashed the check at Equitable, and delivered $7,200 to Via. Via did not participate in the transaction.

We agree with the lower court that Equitable's conduct in dealing with the cashier's check was reasonable. Cavanaugh (and Len's Tavern) had been a customer of Equitable for nineteen years and maintained an average balance of $3,000. The account was described by bank officials as a good one. Cavanaugh possessed a good repayment record on loans from Equitable. None of his checks had ever been returned for insufficient funds during the bank manager's thirteen-year tenure. Moreover, Equitable was in no position to question the authenticity of Appel's endorsement. *See, e.g., Dominion Constr. v. First Nat'l Bank,* 271 Md. 154, 164-65, 315 A. 2d 69, 74-75 (1974), *quoting Cooper v. Union Bank,* 9 Cal. 3d 371, 385-86, 507 P. 2d 609, 620, 107 Cal. Rptr. 1, 12 (1973), a case also involving forged endorsements:

> " '. . . Nothing on the face of the instruments would have led the bank to suspect they were irregular in any way. A single branch of a large bank, as the

testimony indicated, may handle several thousand instruments bearing third party indorsements in a single day. Considering this burden, it would be commercially unreasonable to expect payor banks to undertake foolproof efforts to verify ostensibly valid indorsements.' "

The immediate payment of cash to Cavanaugh is not unreasonable in these circumstances, since Equitable had no reason to suspect that Maryland National would dishonor its own check. Waiting for the cashier's check to clear before allowing Cavanaugh to draw on his account would not have afforded Appel any additional protection. It may have protected Len's Tavern, but only if the forgery had been discovered before the check cleared or before Cavanaugh gave Via the cash. In the normal course of events, once Cavanaugh gave Via the money, Len's Tavern would bear the loss — unless it could recover against Via — because Len's Tavern would be liable to Equitable and Equitable to Maryland National, upon their endorsements, Art. 95B, §§ 3-417, 4-207; and Maryland National would be liable to Appel in a timely suit for conversion for paying on the forged endorsement. In the present case, since the forgery was not reported until after final settlement of the cashier's check, waiting for the check to clear would not have prevented the payment to Cavanaugh and, then subsequently, to Via. Thus, for all of these reasons Equitable clearly acted in a commercially reasonable manner.

*Judgments affirmed; appellants to pay costs.*