821 A.2d 22

**Jeff E. MESSING**

v.

**BANK OF AMERICA, N.A.**

No. 27 Sept. Term, 2002.

Court of Appeals of Maryland.

April 7, 2003.

678

Jeff E. Messing (Marc H. Messing, on brief), Baltimore, for petitioner.

Dennis P. McGlone (Brian L. Moffet of Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

## I.

The case *sub judice* involves a bank check. A check is defined as a draft payable on demand and drawn on a bank. Maryland Code (1974, 2002 Repl.Vol.), Commercial Law Article, § 3–204(f)(i).[1] The circumstances which gave rise to the case before us are, in terms of its genesis, reminiscent of those described in the case of *Board of Inland Revenue v. Haddock.*[2] In that case, the protagonist, Mr. Haddock, after some

---

1. Unless otherwise provided, all statutory references are to the Maryland Code (1974, 2002 Repl.Vol.), Commercial Law Article.

2. *Board of Inland Revenue v. Haddock,* known commonly as "The Negotiable Cow" case, is, in fact, a fictitious case which originally

dispute involving uncollected income-taxes owed, elected to test the limits of the law of checks as it existed at British common law at the time. Operating on the proposition that a check was only an order to a bank to pay money to the person in possession of the check or a person named on the check, and observing that there was nothing in statute or custom at the time specifying that a check must be written on paper of certain dimensions, or even paper at all, Haddock elected to tender payment to the tax collector by a check written on the back of a cow. The Collector of Taxes at first attempted to endorse the check, but, we are informed, the check "appeared to resent endorsement and adopted a menacing posture" at which point the Collector abandoned the attempt and refused to accept the check. Mr. Haddock then led the check away and was subsequently arrested in Trafalgar Square for causing an obstruction, upon which he was said to have observed that "it was a nice thing if in the heart of the commercial capital of the world a man could not convey a negotiable instrument down the street without being arrested." He subsequently was summoned by the Board of Inland Revenue for non-payment of income-tax.

The case *sub judice* arises from Petitioner's irritation with the Bank of America's Thumbprint Signature Program. Under the Thumbprint Signature Program, a bank requests non-customer presenters of checks over the counter to place an "inkless" thumbprint or fingerprint on the face of the check as part of the identification process. The program was developed, as the Court of Special Appeals informs us in its opinion in this case, by the American Bankers Association, working with the Federal Deposit Insurance Corporation (FDIC), the Federal Reserve Banks, the Office of the Comptroller of the Currency, the Federal Bureau of Investigation, and other law enforcement officials and banking trade associations across the county in response to rising instances of check fraud. *Mess-*

---

appeared in the pages of the British humor magazine *Punch,* and since has been re-printed in A.P. Herbert, Uncommon Law: Being sixty-six Misleading Cases revised and collected in one volume, 201–206 (Dorset Press, 1991)(1935).

*ing v. Bank of America,* 143 Md.App. 1, 15–16, 792 A.2d 312, 320–21 (2002). It is undisputed that the Bank of America's Thumbprint Signature Program uses an inkless fingerprinting device that leaves no ink stains or residue.

## II.

At some point in time prior to 3 August 2000, Petitioner, as a holder, came into possession of a check in the amount of Nine Hundred Seventy–Six Dollars ($976.00)(the check) from Toyson J. Burruss, the drawer, doing business as Prestige Auto Detail Center. Instead of depositing the check into his account at his own bank, Petitioner elected to present the check for payment at a branch of Mr. Burruss' bank, Bank of America, the drawee.[3] On 3 August 2000, Petitioner approached a teller at Bank of America's 10 Light Street Banking Center in Baltimore City and asked to cash the check. The teller, by use of a computer, confirmed the availability of funds on deposit, and placed the check into the computer's printer slot. The computer stamped certain data on the back of the check, including the time, date, amount of the check, account number, and teller number. The computer also effected a hold on the amount of $976.00 in the customer's account. The teller gave the check back to the Petitioner, who endorsed it. The teller then asked for Petitioner's identification. Petitioner presented his driver's license and a major credit card. The teller took the endorsed check from Petitioner and manually inscribed the driver's license information and certain credit card information on the back of the check.

At some point during the transaction, the teller counted out $976.00 in cash from her drawer in anticipation of completing

---

**3.** Petitioner's choice could be viewed as an attempt at risk shifting. Petitioner, an attorney, may have known that he could have suffered a fee charged by his own bank if he deposited a check into his own account and the bank on which it was drawn returned it for insufficient funds, forged endorsement, alteration, or the like. Petitioner's action, viewed against that backdrop, would operate as a risk shifting strategy, electing to avoid the risk of a returned-check fee by presenting in person the check for acceptance at the drawee bank.

the transaction. She asked if the Petitioner was a customer of Bank of America. The Petitioner stated that he was not. The teller returned the check to Petitioner and requested, consistent with bank policy when cashing checks for non-customers, that Petitioner place his thumbprint on the check.[4] Petitioner refused and the teller informed him that she would be unable to complete the transaction without his thumbprint.

Petitioner requested, and was referred to, the branch manager. Petitioner presented the check to the branch manager and demanded that the check be cashed notwithstanding Petitioner's refusal to place his thumbprint on the check. The branch manager examined the check and returned it to the Petitioner, informing him that, because Petitioner was a non-customer, Bank of America would not cash the check without Petitioner's thumbprint on the instrument. After some additional exchanges, Petitioner left the bank with the check in his possession. The branch manager advised the teller that Petitioner had left the bank with his check. In response, the teller released the hold on the customer's funds, voided the transaction in the computer, and placed the cash back in her teller drawer.

Rather than take the check to his own bank and deposit it there, or returning it to Burruss, the drawer, as dishonored and demanding payment, Petitioner, two months later, on 10 October 2000, filed a declaratory judgment action against Bank of America (the Bank) in the Circuit Court for Baltimore City. Petitioner claimed that the Bank had violated the Maryland Uniform Commercial Code (UCC) and had violated his personal privacy when the teller asked Petitioner to place an "inkless" thumbprint on the face of the check at issue. Petitioner asked the trial court to declare that: 1) Petitioner had provided "reasonable identification" without his thumbprint;

---

**4.** The writing surface at each teller station at the branch was posted with a sign relating to the FDIC. Clearly visible in the lower right quadrant of each sign were the following words: "Thumbprint Signature Participating Member. For the protection of our customers, Thumbprint Signatures will be obtained from all non-account holders seeking to cash checks."

2) under § 3–501(b)(2), a thumbprint is not reasonable identification; 3) requiring a thumbprint of non-customers to cash a check is illegal, inappropriate, and unnecessary; 4) requiring non-customers to provide a thumbprint is a violation of the personal privacy of non-customers; 5) the Bank be required to cease requiring thumbprints in Maryland; 6) the Bank had "accepted" the check when presented by Petitioner; 7) the Bank "wrongfully dishonored" the check; and 8) the Bank wrongfully converted the check. Petitioner also sought injunctive relief directing Bank of America to cease participation in the Thumbprint Signature Program.

On 15 November 2000, the Bank filed a Motion to Dismiss or, in the alternative, for Summary Judgment. Petitioner opposed the Bank's Motion and filed a "cross" Motion for Summary Judgment. After the Circuit Court heard oral arguments on the pending motions, it denied Petitioner's request for injunctive relief and entered summary judgment in favor of the Bank, dismissing the Complaint with prejudice.[5]

Petitioner appealed on 17 January 2001. The Court of Special Appeals concluded that the Circuit Court's decision in favor of the Bank was legally correct, but remanded the case for entry of a proper declaratory judgment as to the rights of the parties consistent with its opinion. *Messing v. Bank of America,* 143 Md.App. 1, 792 A.2d 312 (2002).

Petitioner petitioned this Court for a writ of certiorari. On 10 June 2002, we granted the petition. *Messing v. Bank of America,* 369 Md. 301, 799 A.2d 1262 (2002).

### III.

Six questions are presented for our consideration. They are:

"1. Did the Court of Special Appeals err in construing the requirement of giving "reasonable identification" under the Annotated Code of Maryland, Commercial Law

---

5. The Circuit Court's Order consisted of a one page form "order" without elaboration.

Article, Section 3–501(b)(2), to require a thumbprint if demanded by a drawee to whom presentment of a check is made, notwithstanding the proffer of reasonable and customary documentary forms of identification?

"2. Did the Court of Special Appeals err in finding the [Respondent] did not accept the particular check at issue, as "acceptance" is defined in the Annotated Code of Maryland, Commercial Law Article, Section 3–409(a)?

"3. Did the Court of Special Appeals err in finding that the [Respondent] did not dishonor the particular check at issue, as "dishonor" is defined in the Annotated Code of Maryland, Commercial Law Article, Section 3–502(d)(1)?

"4. Did the Court of Special Appeals err in finding the [Respondent] did not convert the cash proceeds of the particular check at issue, as "conversion" is set out in the Annotated Code of Maryland, Commercial Law Article, Section 3–420?

"5. Did the Court of Special Appeals err in not giving full effect to the plain language of the Annotated Code of Maryland, Commercial Law Article, Section 3–111, that states that when no address is stated in an instrument, "The place of payment is the place of business of the drawee or maker. If the Drawee or maker has more than one place of business, the place of business is any place of business of the drawee or maker chosen by the person entitled to enforce the instrument"?

"6. Did the Court of Special Appeals err in vacating the judgment of the Circuit Court for Baltimore City and remanding the case to the Circuit Court for the entry of a written declaration of the rights of the parties consistent with the Court of Special Appeals' opinion?"

### IV.

 Summary judgment is only appropriate where, when viewing the motion and response in a light most favorable to

the non-moving party, there are no genuinely disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. *Beatty v. Trailmaster Prod., Inc.,* 330 Md. 726, 737, 625 A.2d 1005, 1010–11(1993); Md. Rule 2–501(e). The standard of review of a trial court's grant of a motion for summary judgment on the law is *de novo,* that is, whether the trial court's legal conclusions were legally correct. *Tyma v. Montgomery County,* 369 Md. 497, 504, 801 A.2d 148, 152 (2002); *Lippert v. Jung,* 366 Md. 221, 227, 783 A.2d 206, 209 (2001); *Heat and Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202, 1205–06 (1990). Under this standard, we review the trial court's ruling on the law, considering the same material from the record and deciding the same legal issues as the circuit court. *Green v. H & R Block, Inc.,* 355 Md. 488, 502, 735 A.2d 1039, 1047 (1999). Where, as here, the material facts are undisputed, the reasonableness of the Bank's actions are for the court to decide. *Gillen v. Maryland Nat'l Bank,* 274 Md. 96, 102–03, 333 A.2d 329, 334 (1975)(question of bank's duty of care is one of law when the facts are undisputed). Although granting summary judgment in a declaratory judgment action is the exception rather than the rule, circumstances may warrant the entry of a full or partial summary judgment even in such a context. *Megonnell v. United Servs. Auto. Ass'n,* 368 Md. 633, 642, 796 A.2d 758, 764 (2002); *Nationwide Mut. Ins. Co. v. Scherr,* 101 Md.App. 690, 695, 647 A.2d 1297, 1299 (1994); *Loewenthal v. Security Ins. Co.,* 50 Md.App. 112, 117, 436 A.2d 493, 496 (1981).

Making a determination in this case will involve a considerable amount of statutory analysis. With that in mind, we reiterate the rules set forth in *Jefferson v. Jones,* 286 Md. 544, 547–48, 408 A.2d 1036, 1039 (1979) (citations omitted), where we stated:

Although we are directed by the General Assembly to construe the Uniform Commercial Code in a manner which "make[s] uniform the law among the various [states]" adopting it, Md.Code (1975), Commercial Law Art., §§ 1–102(1), –102(2)(c), we nonetheless utilize, in interpreting the Code, the same principles of statutory construction that we

would apply in determining the meaning of any other legislative enactment. These well settled principles require ascertainment of the legislative intent, and if, as is the case here, construction becomes necessary because the terminology chosen is not clear, then we must consider not only the significance of the literal language used, but the effect of our proposed reading in light of the legislative purpose sought to be accomplished. Unlike most state statutory enactments, the U.C.C. is accompanied by a useful aid for determining the purpose of its provisions—the official comments of the Code's draftsmen. While these comments are not controlling authority and may not be used to vary the plain language of the statute, they are an excellent place to begin a search for the legislature's intent when it adopted the Code.

## V.

### A. Petitioner's Arguments:

Petitioner argues initially that he properly presented the check to the drawee bank and that the bank accepted the check. In Petitioner's view, the Bank's request for thumbprint identification was unreasonable as it would not aid the Bank in identifying the Petitioner as the proper person to pay at the time payment was made, but would be useful only at some later date, if at all. Petitioner's argument is fairly straight forward, adopting a "follow the bouncing ball" approach to the application of Maryland Code (1957, 2002 Repl. Vol.), Commercial Law Article, Title 3, to the facts of this case.[6] Petitioner's argument is that § 3–111 instructs that the correct location for him to present the check at issue for payment was at the offices of the bank named on the check as the drawee.[7] According to § 3–111:

---

6. Definitions for the terms used for the parties to the check and their various actions in negotiating the check are found in § 3–103.

7. See also Federal Reserve Board Regulation CC, 12 C.F.R. 229.36(b).

> Except as otherwise provided for items in Title 4 [Bank Deposits and Collections], an instrument is payable at the place of payment stated in the instrument. If no place of payment is stated, an instrument is payable at the address of the drawee or maker stated in the instrument. If no address is stated, the place of payment is the place of business of the drawee or maker. If a drawee or maker has more than one place of business, the place of payment is any place of business of the drawee or maker chosen by the person entitled to enforce the instrument. If the drawee or maker has no place of business, the place of payment is the residence of the drawee or maker.

In short, Petitioner's position is that, assuming all else is in order, § 3–111 requires Bank of America to pay a check drawn on one of its customer's accounts if presentment is made over the counter at the Bank.[8] Petitioner then argues why his presentment was in order, according to the relevant code provisions, thus, in his view, requiring the Bank to pay the check.

Petitioner cites § 3–501, which states:

(a) "Presentment" means a demand made by or on behalf of a person entitled to enforce an instrument (i) to pay the instrument made to the drawee or a party obliged to pay the instrument or, in the case of a note or accepted draft payable at a bank, to the bank, or (ii) to accept a draft made to the drawee.

(b) The following rules are subject to Title 4, agreement of the parties, and clearinghouse rules and the like:

(1) Presentment may be made at the place of payment of the instrument and must be made at the place of payment if

---

8. Petitioner is incorrect. Section 3–111 merely requires the Bank to receive the *presentment* of a check for payment, return, or dishonor. Put another way, § 3–111 identifies the location where the check ultimately is to be sent so that the drawee Bank may have notice of the order to pay and make a decision with regards to that order. As is discussed *infra*, § 3–111 does not require the Bank to *accept* the check (§ 3–409), or to pay the check (§. 3–413 and § 4–215). Thus, the answer to Petitioners fifth question presented is "no.".

the instrument is payable at a bank in the United States; may be made by any commercially reasonable means, including an oral, written, or electronic communication; is effective when the demand for payment or acceptance is received by the person to whom demand for payment or acceptance is received by the person to whom presentment is made; and is effective if made to any one of two or more makers, acceptors, drawees, or other payors.

(2) Upon demand of the person to whom presentment is made, the person making presentment must (i) exhibit the instrument, (ii) give reasonable identification and, if presentment is made on behalf of another person, reasonable evidence of authority to do so, and (iii) sign a receipt on the instrument for any payment made or surrender the instrument if full payment is made.

(3) Without dishonoring the instrument, the party to whom presentment is made may (i) return the instrument for lack of a necessary indorsement, or (ii) refuse payment or acceptance for failure of the presentment to comply with the terms of the instrument, an agreement of the parties, or other applicable law or rule.

(4) The party to whom presentment is made may treat presentment as occurring on the next business day after the day of presentment if the party to whom presentment is made has established a cutoff hour not earlier than 2 p.m. for the receipt and processing of instruments presented for payment or acceptance and presentment is made after the cutoff hour.

Petitioner argues that he correctly made "presentment" of the check to the Bank pursuant to § 3–111 and § 3–501(a), and demands that, as the person named on the instrument and thus entitled to enforce the check, the drawee Bank pay him. Petitioner further argues that his presentment was in the proper form set forth in § 3–501(b)(2). Petitioner points out that he exhibited the instrument when he arrived at the counter and that, upon request, he provided reasonable identification in the form of his driver's license and a major credit card, and that he surrendered the check to the teller, who

stamped it in her computer. The subsequent request for Petitioner to place his thumbprint on the check was, in Petitioner's view, not "reasonable" and therefore improper under § 3–501(b)(2)(ii). Petitioner argues that the rightness of his view is because the purpose of providing reasonable identification at the time of presentment is so that a bank can assure itself that it is making payment to the proper person at the time payment is made. Petitioner argues that a thumb-print will not provide that information at the time payment is made over the counter, but only at some later date. While we shall address the reasonableness of the thumbprint identifica-tion, *infra*, the issue is not dispositive as to Petitioner's claims against the Bank, and is, in fact, largely collateral.

In a continuation, Petitioner contends that the teller, by placing the check in the slot of her computer, and the comput-er then printing certain information on the back of the check, accepted the check as defined by § 3–409(a), which states:

(a) "Acceptance" means the drawee's signed agreement to pay a draft as presented. It must be written on the draft and may consist of the drawee's signature alone. Accep-tance may be made at any time and becomes effective when notification pursuant to instructions is given or the accepted draft is delivered for the purpose of giving rights on the acceptance to any person.

Relying on § 3–401(b), Petitioner argues that the act of the Bank's computer printing information on the back of the check constitutes the Bank's signature, and thus effectuates accep-tance of the check on the part of the Bank. Section 3–401 states:

(a) A person is not liable on an instrument unless (i) the person signed the instrument, or (ii) the person is repre-sented by an agent or representative who signed the instru-ment and the signature is binding on the represented person under § 3–402.

(b) A Signature may be made (i) manually or by means of a device or machine, and (ii) by the use of any name, including a trade or assumed name, or by a word, mark or

symbol executed or adopted by a person with present intention to authenticate a writing.

In support, Petitioner points to part of the Official Comment 2 attached to § 3–409, as follows:

> Subsection (a) states the generally recognized rule that the mere signature of the drawee on the instrument is a sufficient acceptance. Customarily the signature is written vertically across the face of the instrument, but since the drawee has no reason to sign for any other purpose a signature in any other place, even on the back of the instrument, is sufficient. It need not be accompanied by such words as "Accepted," "Certified," or "Good." [9]

Thus, according to Petitioner, because the Bank's computer printed information on the back of the check, under § 3–401(b) the Bank "signed" the check, said "signature" being sufficient to constitute acceptance under § 3–409(a).

Petitioner's remaining arguments line up like so many dominos. According to Petitioner, having established that under his reading of § 3–409(a) the Bank accepted the check, Petitioner advances that the Bank is obliged to pay him, pursuant to § 3–413(a) which states:

> (a) The acceptor of a draft is obliged to pay the draft (i) according to its terms at the time it was accepted, even though the acceptance states that the draft is payable "as originally drawn" or equivalent terms, (ii) if the acceptance varies the terms of the draft, according to the terms of the draft as varied, or (iii) if the acceptance is of a draft that is an incomplete instrument, according to its terms when completed, to the extent stated in §§ 3–115 and 3–407. The obligation is owed to a person entitled to enforce the draft or to the drawer or an indorser who paid the draft under § 3–414 or § 3–415.

---

**9.** Among other things, Petitioner omits the last sentence of Comment 2, which reads: "The last sentence of subsection (a) states the generally recognized rule that an acceptance written on the draft takes effect when the drawee notifies the holder or gives notice according to instructions."

Petitioner continues that because Bank of America accepted the check, but then failed to make payment, by the terms of § 3–502(d)(1) the Bank dishonored the check and became solely liable to Petitioner for payment. Section 3–502(d)(1) states:

(d) Dishonor of an accepted draft is governed by the following rules:

(1) If the draft is payable on demand, the draft is dishonored if presentment for payment is duly made to the acceptor and the draft is not paid on the day of presentment.

Petitioner claims that the drawee Bank of America solely would be liable as the acceptor because, under § 3–414(c), the drawer of the check is discharged upon acceptance by the Bank. Section 3–414(c) states: "If a draft is accepted by a bank, the drawer is discharged, regardless of when or by whom acceptance was obtained." [10]

Petitioner extends his line of reasoning by arguing that the actions of the Bank amounted to a conversion under § 3–420, which states, in allegedly relevant part:

(a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be

---

**10.** Petitioner, however, overlooks § 4–601 which states:

(a) The obligation of a party to pay the instrument is discharged as stated in this title or by an act or agreement with the party which would discharge an obligation to pay money under a simple contract.

(b) Discharge of the obligation of a party is not effective against a person acquiring rights of a holder in due course of the instrument [§ 3–302] without notice of the discharge.

No one was discharged on the instrument at the time Petitioner acquired rights in it. § 4–102(a) states:

To the extent that items within this title are also within Titles 3 and 8, they are subject to those titles. If there is conflict, this title governs Title 3, but Title 8 [Investment Securities] governs this title.

brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or co-payee.

Based on this, Petitioner argues that because the Bank accepted the check, an act which, according to Petitioner, discharged the drawer, he no longer had enforceable rights in the check and only had a right to the proceeds.[11] Petitioner's position is that the Bank exercised unauthorized dominion and control over the proceeds of the check to the complete exclusion of the Petitioner after the Bank accepted the check and refused to distribute the proceeds, counted out by the teller, to him.

### B. Acceptance under § 3–409(a).

Predictably, Bank of America argues that Petitioner's interpretation of Maryland's U.C.C. is incorrect. Our intermediate appellate court brethren largely agreed with the Bank's point of view. Setting aside for the moment the Bank's arguments as to the reasonableness of requiring a thumbprint, we turn to the Bank's obligations, or lack thereof, with regard to the presentment of a check by someone not its customer. Bank of America argues, correctly, that it had no duty to the Petitioner, a non-customer and a stranger to the Bank, and that nothing in the Code allows Petitioner to force Bank of America to act as a depository bank [§ 4–105] and cash a check for a non-customer. As the Supreme Court pointed out in *Barnhill v. Johnson*, 503 U.S. 393, 398–99, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992):

> Under the U.C.C., a check is simply an order to the drawee bank to pay the sum stated, signed by the makers and payable on demand. Receipt of a check does not, however, give the recipient a right against the bank. The recipient may present the check, but if the drawee bank refuses to honor it, the recipient has no recourse against the drawee.

---

**11.** See *supra* n. 10, however.

* * * * *

This is because ... receipt of a check gives the recipient no right in the funds held by the bank on the drawer's account.

Absent a special relationship, a non-customer has no claim against a bank for refusing to honor a presented check. *City Check Cashing, Inc. v. Manufacturers Hanover Trust Co.* 166 N.J. 49,·764 A.2d 411, 417 (2001). A "transient, non-contractual relationship" is not enough to establish a duty. *Id.* (quoting *FMC Corp v. Fleet Bank,* 226 A.D.2d 225, 641 N.Y.S.2d 25, 26 (1996)). It is also well settled that a check does not operate as an assignment of funds on deposit, *Ward v. Federal Kemper Ins. Co.,* 62 Md.App. 351, 357–58, 489 A.2d 91, 94 (1985), and the bank only becomes obligated upon acceptance of the instrument. This is made clear ·by § 3–408, which states:

A check or other draft does not of itself operate as an assignment of funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until the drawee accepts it.

Once a·bank accepts a check, under § 3–409, it is obliged to pay on the check under § 3–413.[12] Thus, the relevant ques-

---

**12.** These rules of commercial practice are of considerable long standing. In *Moses v. President & Directors of Franklin Bank,* 34 Md. 574, 580–81 (1871), the Court stated:

A check does not, as contended by the appellant, operate as an assignment *pro tanto* of the fund upon which it is drawn, until it is accepted, or certified to be good, by the bank holding the funds. It is true, a bank, if in funds of the drawer, is ordinarily bound to take up his checks; but it can only be held liable to the holder for its refusal to do so, upon the ground of fraud, whereby he loses the money or some part of it, for which the check is drawn. It is certainly a general rule, that a drawee who refuses to accept a bill of exchange cannot be held liable on the bill itself; nor to the holder for the refusal to accept, except it be upon the ground of fraud and loss to the latter. A bank upon which a check is drawn occupies in this respect a similar position to that of the drawee of a bill of exchange. It is but the agent of the depositor, holding his funds upon an implied contract to honor and take up his checks to the extent of the funds deposited. The obligation to accept and pay is not to the holder of the check, but to the drawer. If, therefore, the depositor should direct that a check should not be paid, the bank would be bound to observe the direction, unless it had previously accepted the check by

tion in terms of any rights Petitioner had against the Bank turns not on the reasonableness of the thumbprint identification, but rather upon whether the Bank accepted the check when presented as defined by § 3–409. As will be seen *infra,* the question of the thumbprint identification is relevant only to the issue of whether the Bank's refusal to pay the instrument constituted dishonor under § 3–502, a determination which has no impact in terms of any duty allegedly owed by the Bank to the Petitioner.

Respondent Bank of America argues that the intermediate appellate court correctly found that it did not "accept" the check as that term is defined in § 3–409(a). *Messing,* 143 Md.App. at 16–19, 792 A.2d at 321–23 (2002). We agree. The mere fact that the teller's computer printed information on the back of the check does not, as Petitioner contends, amount by itself to an acceptance. Section 3–409(a) states:

(a) "Acceptance" means the drawee's signed agreement to pay a draft as presented. It must be written on the draft and may consist of the drawee's signature alone. Acceptance may be made at any time and becomes effective when notification pursuant to instructions is given or the accepted draft is delivered for the purpose of giving rights on the acceptance to any person.

Petitioner relies on the first two sentences of the statute, while ignoring the balance. The statute clearly states that acceptance becomes effective when the presenter is notified of that fact. The facts demonstrate that at no time did the teller notify Petitioner that the Bank would pay on the check. Rather, the facts show that:

[T]he check was given back to [Petitioner] by the teller so that he could put his thumbprint signature on it, not to notify or give him rights on the purported acceptance.

---

certifying it to be good, in which case it would be bound to pay; at any rate to a subsequent holder. The bank, therefore, ordinarily, owes no duty to the holder of a check drawn upon it, nor is it bound, except to the depositor, to accept or pay the check, though it may have sufficient funds of the drawer with which to do it.

After appellant declined to put his thumbprint signature on the check, he was informed by both the teller and the branch manager that it was against bank policy to honor the check without a thumbprint signature. Indignant, [Petitioner] walked out of the bank with the check.

143 Md.App. at 19, 792 A.2d at 323. As the intermediate appellate court correctly pointed out, the negotiation of the check is in the nature of a contract, and there can be no agreement until notice of acceptance is received.[13] *Id.* As a result, there was never acceptance as defined by § 3–409(a), and thus the Bank, pursuant to § 3–408 never was obligated to pay the check under § 3–413(a). Thus, the answer to Petitioner's second question presented is "no."

### C. "Conversion" under § 3–420.

 Because it never accepted the check, Bank of America argues that the intermediate appellate court also correctly concluded that the Bank did not convert the check or its proceeds under § 3–420. Again, we must agree. The Court of Special Appeals stated:

"Conversion," we have held, "requires not merely temporary interference with property rights, but the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor." *Yost v. Early,* 87 Md.App. 364, 388, 589 A.2d 1291 (1991) (citations omitted)(quotations omitted). At no time did [Respondent] exercise "unauthorized dominion and control [over the check] to the complete exclusion of the rightful possessor," [Petitioner].

[Petitioner] voluntarily gave the check to [respondent's] teller. When [Petitioner] indicated to the teller that he was not an account holder, she gave the check back to him for a thumbprint signature in accordance with bank policy. After

---

**13.** Where a check is presented for payment over the counter, it is hard, given general business practices, to imagine where acceptance would be effective before the funds paying the check were handed over to the presenter, except where a certified or cashier's check was involved. *Rezapolvi v. First Nat. Bank of Maryland,* 296 Md. 1, 6, 459 A.2d 183, 186 (1983).

being informed by both [Respondent's] teller and branch manager that it was [Respondent's] policy not to cash a non-account holder's check without a thumbprint signature, [Petitioner] left the bank with the check in hand.

Because [Petitioner] gave the check to the teller, [Respondent's] possession of that check was anything but "unauthorized." and having returned the check, within minutes of its receipt, to [Petitioner] for his thumbprint signature, [Respondent] never exercised "dominion and control [over it] to the complete exclusion of the rightful possessor,"[Petitioner]. In short, there was no conversion.

*Messing,* 143 Md.App. at 21, 792 A.2d at 324.

Nor was there a conversion of the cash proceeds. As we set forth *supra,* under § 3–409(a), Bank of America never accepted the check, and thus never became obligated under § 3–413(a) to pay on the check. Pursuant to § 3–408, Petitioner never had a right to the funds on deposit, and Bank of America cannot convert funds to which Petitioner has no right in the first instance.

██ Similarly, as Bank of America never accepted the check, Petitioner's argument that he no longer has rights in the instrument is incorrect.[14] Because Bank of America did not accept the check pursuant to § 3–409, the drawer was not, as Petitioner alleges, discharged under § 3–414(c).[15] At the time Petitioner left the Bank, he retained all of his rights in the instrument, and was free to either present the check again and provide a thumbprint as requested, negotiate the check to some other third party, or to deposit the check in his own bank. As we will discuss *infra,* were the Bank's refusal to

---

**14.** See § 3–601(b) *supra,* at n. 10. As an aside, pursuant to § 15–804(a), Petitioner would not have recourse to the provisions concerning the recovery of "bad checks" as set forth in §§ 15–801 through 15–804, as under these facts, if the check is dishonored, it nevertheless does not meet the definition of a "bad check" as set forth in Maryland Code (1974, 2002 Repl.Vol.), Criminal Law Article, § 8–103.

**15.** The same result would occur had Petitioner argued that the facts of this case fell under § 3–410(a).

accept the check to amount to dishonor, Petitioner even may proceed against the drawer under § 3–414(b). See *Ward*, 62 Md.App. at 357–58, 489 A.2d at 94. The answer to Petitioner's fourth question presented is "no."

## D. "Reasonable Identification" under § 3–501(b)(2)(ii) and "Dishonor" under § 3–502

We now turn to the issue of whether the Bank's refusal to accept the check as presented constituted dishonor under § 3–501 and § 3–502 as Petitioner contends. Petitioner's argument that Bank of America dishonored the check under § 3–502(d) fails because that section applies to dishonor of an accepted draft. We have determined, *supra*, that Bank of America never accepted the draft. Nevertheless, the question remains as to whether Bank of America dishonored the draft under § 3–502(b), which states:

(b) Dishonor of an unaccepted draft other than a documentary draft is governed by the following rules:

(1) If a check is duly presented for payment to the payor bank otherwise than for immediate payment over the counter, the check is dishonored if the payor bank makes timely return of the check or sends timely notice of dishonor or nonpayment under § 4–301 or § 4–302, or becomes accountable for the amount of the check under 4–302.

(2) If a draft is payable on demand and paragraph (1) does not apply, the draft is dishonored if presentment for payment is duly made to the drawee and the draft is not paid on the day of presentment.

The reason that § 3–502(b)(2) potentially is relevant to the case *sub judice* is because of § 3–501(b)(2) and (3), which state:

(2) Upon demand of the person to whom presentment is made, the person making presentment must (i) exhibit the instrument, (ii) give reasonable identification and, if presentment is made on behalf of another person reasonable evidence of authority to do so, and (iii) sign a receipt on the

instrument for any payment made or surrender the instrument if full payment is made.

(3) Without dishonoring the instrument, the party to whom presentment is made may (i) return the instrument for lack of a necessary indorsement, or (ii) refuse payment or acceptance for failure of the presentment to comply with the terms of the instrument, an agreement of the parties, or other applicable law or rule.

The question is whether requiring a thumbprint constitutes a request for "reasonable identification" under § 3–501(b)(2)(ii). If it is "reasonable," then under § 3–501(b)(3)(ii) the refusal of the Bank to accept the check from Petitioner did not constitute dishonor. If, however, requiring a thumbprint is not "reasonable" under § 3–501(b)(2)(ii), then the refusal to accept the check may constitute dishonor under § 3–502(b)(2). The issue of dishonor is arguably relevant because Petitioner has no cause of action against any party, including the drawer, until the check is dishonored.[16] *Ward,* 62 Md.App. at 358, 489 A.2d at 95; *Stewart v. Citizens and Southern Natl. Bank,* 138 Ga.App. 209, 225 S.E.2d 761 (1976).

Respondent Bank of America argues that its relationship with its customer is contractual, *University Nat'l Bank v. Wolfe,* 279 Md. 512, 514, 369 A.2d 570, 571 (1977); *Kiley v. First Nat'l Bank of Maryland,* 102 Md.App. 317, 326–27, 649 A.2d 1145, 1149 (1994), and that in this case, its contract with its customer, the drawer, authorizes the Bank's use of the Thumbprint Signature Program as a reasonable form of identification. The pertinent part of that Deposit Agreement states:

> You [customer] agree that we [Bank of America] may impose additional requirements we deem necessary or desirable on a payee or other holder who presents for cashing an

---

**16.** A cause of action for wrongful dishonor sounds in tort, not contract. *See* § 4–402; *Wright v. Commercial & Sav. Bank,* 297 Md. 148, 159, 464 A.2d 1080, 1086 (1983); *Siegman v. Equitable Trust Co.,* 267 Md. 309, 313, 297 A.2d 758 (1972); *Boggs v. Citizens Bank & Tr. Co.,* 32 Md.App. 500, 501, 363 A.2d 247 (1976).

item drawn on your account which is otherwise properly payable and if that person fails or refuses to satisfy such requirements, our refusal to cash the item will not be considered wrongful. You [customer] agree that, subject to applicable law, such requirements may include (but are not necessarily limited to) physical ... identification requirements. . . .

According to Respondent, this contractual agreement allowed it to refuse to accept the check, without dishonoring it pursuant to § 3–501(b)(3)(ii), because the Bank's refusal was based upon the presentment failing to comply with "an agreement of the parties." The intermediate appellate court agreed. *Messing*, 143 Md.App. at 19–20, 792 A.2d at 323. We, however, do not.

▮▮▮ The reason why the Bank's contract with its customer is not controlling on the issue of the reasonableness of requiring a thumbprint as identification is because the terms of § 3–501 are not modified by the terms of that contract. The terms of § 3–501(b) require an "agreement of the parties." The term "parties" does not refer to the parties of the Deposit Agreement, but rather, according to § 3–103(a)(8), refers to the parties to an instrument. While Petitioner is a party to the instrument, he is not a party to the Deposit Agreement, nor may he be deemed properly a third party beneficiary thereof. To be effective against the Petitioner, Messing, as the party entitled to enforce the instrument, would have to have been a party to the agreement. § 3–117. Thus, while the Deposit Agreement protects the Bank from a suit for wrongful dishonor brought by its customer, the drawer, as a result of the Bank's potential dishonor of the check because the Bank's demand for a thumbprint was not met, [§ 4–402], the contract has no impact on the determination of the "reasonableness" of the requirement for purposes of § 3–501(b), and subsequently whether the instrument was dishonored for purposes of § 3–502(b)(2). In other words, the Bank and its customer cannot through their contract define the meaning of the term "reasonable" and impose it upon parties who are not in privity with that contract. Whether requiring a thumbprint consti-

tutes "reasonable identification" within the meaning of § 3–501(b)(2)(ii) is therefore a broader policy consideration, and not, as argued in this case, simply a matter of contract. We reiterate that the contract does not apply to Petitioner and, similarly, does not give him a cause of action against the Bank for refusing to accept the check. *Papadopoulos v. Chase Manhattan Bank*, 791 F.Supp. 72, 74–75 (S.D.N.Y.1990). This also means that the Bank cannot rely on the contract as a defense against the Petitioner, on the facts presented here, to say that it did not dishonor the check.

Petitioner, as noted, argues that requiring a thumbprint violates his privacy,[17] and further argues that a thumbprint is not a reasonable form of identification because it does not prove contemporaneously the identity of an over the counter presenter at the time presentment is made. According to Petitioner, the purpose of requiring "reasonable identification" is to allow the drawee bank to determine that the presenter is the proper person to be paid on the instrument. Because a thumbprint does not provide that information at the time presentment and payment are made, Petitioner argues that a thumbprint cannot be read to fall within the meaning of "reasonable identification" for the purposes of § 3–501(b)(2)(ii).

Bank of America argues that the requirement of a thumbprint has been upheld, in other non-criminal circumstances, not to be an invasion of privacy, and is a reasonable and

---

**17.** *Homo Sapiens* possesses a truly opposable thumb. An opposable thumb is a necessary adaptation for a creature whose survival depends on having a firm grasp on the tools and instruments encountered in daily life. In the case *sub judice*, the instrument being grasped was a check. Because when grasping and transferring or receiving a paper, such as a check, one does so normally by holding the paper against the side of the index finger with the assistance of a firmly down pressed thumb, we deduce that on multiple occasions during the passing back and forth of the check while Petitioner attempted to cash it, he inevitably and repeatedly placed his thumbprint upon it. At best, therefore, Petitioner's objection appears not to be to placing his thumbprint on the check, but rather to placing a thumbprint on the check which would be longer lasting and more clearly identifiable over time than would otherwise be the case given normal handling conditions.

necessary industry response to the growing problem of check fraud. The intermediate appellate court agreed, pointing out that the form of identification was not defined by the statute, but that the Code itself recognized a thumbprint as a form of signature, § 1–201(39), and observing that requiring thumbprint or fingerprint identification has been found to be reasonable and not to violate privacy rights in a number of noncriminal contexts. Those observations and authorities are set forth in the opinion of that Court and need not be repeated here. *Messing,* 143 Md.App. at 10–16, 792 A.2d. at 318–321.

More compelling in terms of determining the issue of "reasonableness" is the reasoning of the intermediate appellate court in rejecting Petitioner's argument that § 3–501(b)(2)(ii) implicitly contains a present tense temporal element, stating:

We agree with [Petitioner] that a thumbprint cannot be used, in most instances, to confirm the identity of a non-account checkholder at the time that the check is presented for cashing, as his or her thumbprint is usually not on file with the drawee at that time. We disagree, however, with [Petitioner's] conclusion that a thumbprint signature is therefore not "reasonable identification" for purposes of C.L. § 3–501(b)(2).

Nowhere does the language of C.L. § 3–501(b)(2) suggest that "reasonable identification" is limited to information [Respondent] can authenticate at the time presentment is made. Rather, all that is required is that the "person making presentment must ... give reasonable identification." C.L. § 3–501(b)(2). While providing a thumbprint signature does not necessarily confirm identification of the checkholder at presentment—unless of course the drawee bank has a duplicate thumbprint signature on file—it does assist in the identification of the checkholder should the check later prove to be bad. It therefore serves as a powerful deterrent to those who might otherwise attempt to pass a bad check. That one method provides identification at the time of presentment and the other identification after the check may have been honored, does not prevent the

latter from being "reasonable identification" for purposes of
C.L. § 3–501(b)(2).

143 Md.App. at 16, 792 A.2d at 321. We agree, and find this
conclusion to be compelled, in fact, by our State's Commercial
Law Article.

The reason has to do with warranties. The transfer of a
check for consideration creates both transfer warranties (§ 3–
416(a) and (c)) and presentment warranties (§ 3–417(a) and
(e)) which cannot be disclaimed. The warranties include, for
example, that the payee is entitled to enforce the instrument
and that there are no alterations on the check. The risk to
banks is that these contractual warranties may be breached,
exposing the accepting bank to a loss because the bank paid
over the counter on an item which was not properly payable.
*See* § 4–401; *C.S. Bowen Co., Inc. v. Maryland Nat. Bank*, 36
Md.App. 26, 36–38, 373 A.2d 30, 36–37 (1977). In such an
event, the bank would then incur the expense to find the
presenter, to demand repayment, and legal expenses to pursue
the presenter for breach of his warranties.

In short, when a bank cashes a check over the
counter, it assumes the risk that it may suffer losses for
counterfeit documents, forged endorsements, or forged or
altered checks. Nothing in the Commercial Law Article
forces a bank to assume such risks. *See Barnhill*, 503 U.S.
393, 398–99, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); § 3–408.
To the extent that banks are willing to cash checks over the
counter, with reasonable identification, such willingness ex-
pands and facilitates the commercial activities within the
State. In interpreting the Commercial Law Article, we are
guided by § 1–102, which states in relevant part:

(1) Titles 1 through 10 of this article shall be liberally
construed and applied to promote its underlying purposes
and policies.

(2) Underlying purposes and policies of Titles 1 through
10 of this article are

(a) to simplify, clarify and modernize the law governing
commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

Because the reduction of risk promotes the expansion of commercial practices, we believe that the direction of § 1–102(2)(b) requires that we conclude that a bank's requirement of a thumbprint placed upon a check presented over the counter by a non-customer is reasonable. *Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1230–31(5th Cir.1973); *DaSilva v. Sanders*, 600 F.Supp. 1008, 1013 (D.D.C.1984). As the intermediate appellate court well documented, the Thumbprint Program is part of an industry wide response to the growing threat of check fraud. *Messing*, 143 Md.App. at 15–16, 792 A.2d at 320–21. Prohibiting banks from taking reasonable steps to protect themselves from losses could result in banks refusing to cash checks of non-customers presented over the counter at all, a result which would be counter to the direction of § 1–102(2)(b).

As a result of this conclusion, Bank of America in the present case did not dishonor the check when it refused to accept it over the counter. Under § 3–501(b)(3)(ii), Bank of America "refused payment or acceptance for failure of the presentment to comply with ... other applicable law or rule." The rule not complied with by the Petitioner—presenter was § 3–502(b)(2)(ii), in that he refused to give what we have determined to be reasonable identification. Therefore, there was no dishonor of the check by Bank of America's refusal to accept it. The answer to Petitioner's third question is therefore "no," as is the answer to Petitioner's first question, though our reasoning differs somewhat from that of the Court of Special Appeals.

### E. Declaratory Judgment.

As a final matter, we agree with the intermediate appellate court's conclusion that, because Messing's suit included requests for declaratory judgment, the circuit court

must enter a written declaration of the rights of the parties. *Messing,* 143 Md.App. at 23, 792 A.2d at 325; *See Jackson v. Millstone,* 369 Md. 575, 594–95, 801 A.2d 1034, 1045–46 (2002).

> Although a summary judgment in a declaratory judgment action is the exception rather than the rule, circumstances may warrant the entry of a full or partial summary judgment. *See Pennsylvania Nat. Mut. v. Gartelman,* 288 Md. 151, 416 A.2d 734 (1980); *National Grange Mut. Ins. v. Pinkney,* 284 Md. 694, 399 A.2d 877 (1979). As the Court of Appeals stated in *Dart Drug Corp. v. Hechinger* Co., 272 Md. 15, 29, 320 A.2d 266 (1974), "[w]hile a declaratory decree need not be in any particular form, it must pass upon and adjudicate the issues raised in the proceeding, to the end that the rights of the parties are clearly delineated and the controversy terminated...."

*Loewenthal,* 50 Md.App. at 117, 436 A.2d at 496. Because the circuit court granted summary judgment without a declaration of the parties' rights, the intermediate appellate court is correct that the trial court's judgment must be vacated [18]and the case remanded to the circuit court to enter a proper written declaration of the rights of the parties consistent with this opinion. The answer to Petitioner's sixth and final question is therefore, no.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

ELDRIDGE, Judge, concurring in part and dissenting in part.

I agree that the Circuit Court erred in failing to render a declaratory judgment. I cannot agree with the majority's holding that, after the petitioner presented his driver's license

---

**18.** The trial court's denial of Messing's injunctive relief prayer was correct. The lack of a declaration of rights, however, requires a vacation. This does not mean that any part of Petitioner's Complaint may be re-litigated. The mandate fashioned in this case is designed such that the end result is solely to have the circuit court enter a proper declaration of rights, consistent with this opinion, as well as to deny the injunctive relief it previously denied.

and a major credit card, it was "reasonable" to require the petitioner's thumbprint as identification.

Today, honest citizens attempting to cope in this world are constantly being required to show or give drivers' licenses, photo identification cards, social security numbers, the last four digits of social security numbers, mothers' "maiden names," 16 digit account numbers, etc. Now, the majority takes the position that it is "reasonable" for banks and other establishments to require, in addition, thumbprints and finger-prints. Enough is enough. The most reasonable thing in this case was petitioner's "irritation with the Bank of America's Thumbprint Signature Program." (Majority opinion at p. 679).

Chief Judge Bell has authorized me to state that he joins this concurring and dissenting opinion.